# RIGGS FIRE INSURANCE COMPANY *v.* SHEDD.

### MECHANICS' LIENS; SUBCONTRACTORS.

1. Whether a building was completed or not on a given date within the meaning of the mechanics' lien law so as to affect the rights of lienors, will be determined by what the common intelligence and common usage regard as completion, always, however, with reference to the building contract; but no amount of work is too small, the completion of which is required, to prevent the consummation of a fraud.

2. Upon a review of the evidence relating to the question of the completion of a building on a certain date in a suit to enforce mechanics' liens, *held* that the building was not then complete so as to defeat the liens.

3. Where a building contract provides for the payment of the contract price in instalments as the work progresses and for a final payment upon completion, and requires the contractor to furnish the owner a receipt or release from the subcontractors before any such payment shall be made, the payment by the owner of the final instalment to the contractor and his sureties without the knowledge or consent of the subcontractors, will not defeat the right of the latter to enforce their liens against the building, especially where it appears that the agent of the owner previously told the subcontractors that no settlement would be made until the contractor procured a receipt or releases from them; *distinguishing* Herrell v. Donovan, 7 App. D. C. 322.

4. The fact that the owner, in such a case, paid the final instalment due on the contract to the contractor and his sureties upon an understanding with them that the subcontractors should be settled with, will not relieve his property from liability for the subcontractors' liens.

No. 923.  Submitted December 5, 1899.  Decided March 6, 1900.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia, in a suit to enforce mechanics' liens. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is a suit in equity instituted in the Supreme Court

of the District to enforce mechanics' liens against a part of lot 14, in square number 223, in this city, the property of the appellant, The Riggs Fire Insurance Company.

On March 3, 1896, one of the appellees, William C. Morrison, who was one of the defendants in the court below, contracted with the Insurance Company to erect a building on the lot mentioned for the sum of $10,958, payable in certain instalments as the work progressed, on the certificate of the architect. The contract was in writing. It was provided by it that the work should be finished on or before July 15, 1896; that the money for it should be paid in six instalments, five of which, amounting in the aggregate to $8,000, are not of importance in this suit, as they were duly and properly paid; that the sixth instalment, amounting to $2,958, being the final instalment of the contract price, should be paid when the building was "all complete, the keys delivered, and the drawings and specifications returned to the architect;" that each and all the instalments should be paid on the certificate of the architect that the work was done and the payment properly due; that such certificate, however, should not release the contractor from liability to replace the work, if it should afterwards be discovered to have been badly done; that in each case the contractor should obtain from each subcontractor a receipt or release showing that there were no claims against him on account of material furnished or work done on the building; that the drawings and specifications should be taken as co-operating; and that the contractor should deliver up the work, when complete, in perfect repair and good condition.

Indorsed upon the contract was a bond, executed by the builder, Morrison, with two sureties, Samuel Ross and Michael Shea, in the sum of $5,000, conditioned for the due performance of the contract by Morrison, and that he should keep the building and ground harmless and free from liens for three months and one day after completion of the work.

Morrison entered upon the performance of the work; and, as usual, employed several subcontractors to contribute to its execution. As it approached, or had reached, completion, it was found that some of these subcontractors had balances due to them from Morrison. Then it was that the transaction occurred which gave occasion for the present controversy.

It seems that about September 17, 1896, Morrison called upon Mr. Birge, the secretary of the Insurance Company, and apparently its general manager, for the purpose of getting a settlement from him. It does not appear that the work was then finished. Birge, at that time, told Morrison that he would not settle without releases from the subcontractors; and Morrison shortly afterwards stated to the secretary that he was having trouble in getting releases from some of the parties. Birge, however, insisted that it was impossible to have a settlement without releases from the subcontractors. In the time between September 17 and September 24 several of the subcontractors came into the office of the Insurance Company and notified Birge of their claims against Morrison; and they were informed by Birge that there would be no settlement with Morrison unless he procured and presented releases from his subcontractors. On the evening of September 23, Morrison and Ross, one of the sureties on his bond, and who was also a subcontractor, called upon Birge, and again requested a settlement from him. He said that he would not settle unless both sureties were present. On the morning of September 24, 1896, Morrison again called on Birge, this time with both of his sureties, a certificate of the architect having been procured in the meantime to the effect that Morrison was entitled to the final payment under the contract, stated to amount to $2,915. But, according to Morrison's own statement, this amount was not then due; for it seems that, on August 28, 1896, he had received $500 in anticipation of it; and taking into account some charges for extra work and some deductions

for work not done, which very nearly balanced each other, the amount then due, if it was actually due and payable, was $2,457.66. For this sum of $2,457.66, after some conference between the parties, Birge drew the check of the company, procured its signature by the president of the company, signed it himself, as secretary, the check being drawn to the order of William C. Morrison, wrote on the back of it an order for its payment to Samuel Ross and Michael Shea, and delivered it to Samuel Ross. Samuel Ross and Michael Shea then indorsed it in blank; and Ross took it and deposited it to his own credit. Out of the proceeds he paid his own bill for materials furnished to the building, amounting to $1,122.75, and subsequently also paid Shea, who had likewise done work on the building, the full amount of his bill for such work, $288.10. What he did with the residue of the money does not distinctly appear; but it would seem that he appropriated that also to his own use in satisfaction of some other alleged claims against Morrison. The other subcontractors received nothing on account of their claims; and they proceeded forthwith to file their notices of mechanics' liens against the property. One of these notices was filed on the same day, September 24, 1896; one on the next day, September 25; and four others on September 26, 1896. The present proceeding in equity was instituted on October 27, 1896, to enforce the liens created by these notices.

After testimony taken, and the submission of the cause to the Supreme Court of the District, that court, holding that the payment of $2,457.66 on September 24, 1896, by the Insurance Company to Morrison and Ross was in fraud of the rights of the subcontractors, decreed that the lot of land and building of the Insurance Company was subject to the liens of the subcontractors who had filed their notices, to the amount of $2,457.66, with interest thereon from September 24, 1896; and referred the cause to the auditor of the court to state an account. The auditor stated the account.

There were some exceptions to it, which were allowed and sustained. But upon the report, as modified by these allowances, the court rendered a final decree, directing the Insurance Company to pay into the registry of the court within sixty days the sum of $2,457.66, with the sum of $380.98, being the interest thereon from September 24, 1896, to April 24, 1899, which seems to have been the day on which the auditor made up his report, and further interest at the rate of 6 per centum per annum from April 24, 1899, to the time of payment; and it further proceeded to distribute the fund among the subcontractors. In default of such payment by the Insurance Company, it ordered the property to be sold, and made the usual provisions for such sale.

From this decree the Insurance Company has appealed to this court.

*Mr. Wm. F. Mattingly* for the appellant:

1. The lienors are all subcontractors. Their rights are only such as the statute gives them. They can not secure any lien or right to lien by giving notice to the owner. They can only obtain a lien on the property by filing notice of intention to claim a lien in the office of the clerk of the court, prior to the payment of the money by the owner to the contractor at the time stated in the contract. *Herrell* v. *Donovan,* 7 App. D. C. 322. Notice by subcontractor to owner that a balance is due him does not impose on the owner the duty of retaining a portion of the contract price to satisfy any lien which the subcontractor may subsequently file. *McCants* v. *Bush,* 70 Cal. 125.

2. The certificate of the architect that Morrison was entitled to his last payment was conclusive of the rights of all parties concerned, unless it is shown that it was obtained by the owner by collusion or fraud. 27 Encyc. of Law, 77; *Railway Co.* v. *Price,* 138 U. S. 185; *Sheffield* v. *Gordon,* 151 U. S. 285.

3. The provision in the contract, that the contractor

should produce a receipt or release of liens from subcontractors before being entitled to demand payment, is one that could be waived by the parties to the contract, with the consent of the bondsmen, and it was so waived.

*Mr. Arthur A. Birney, Mr. Edward L. Gies, Mr. Samuel Maddox, Mr. W. T. S. Curtis* and *Mr. W. W. Douglas* for the appellees.

Mr. Justice Morris delivered the opinion of the Court:

There is a preliminary question of fact presented in this case respecting the time of the completion of the building mentioned in the proceedings. It is claimed on behalf of the appellant that it was substantially finished and complete at the time at which the last payment was made, September 24, 1896. On behalf of the appellees it is claimed that several things then remained undone which were required by the contract between the builder and the owner, and that the work of construction was not then complete.

Undoubtedly it is matter of common experience that, in the construction of houses which are supposed to have been completed, many details of minor importance have often been neglected or overlooked. Of course, strictly speaking, no work can be regarded as finished and complete when the slightest thing required by the contract has been left undone. Until the last nail has been driven, and every key has been fitted, and the minutest detail has been arranged, no work can be said to have been fully completed. And yet here, as elsewhere, by common usage, the maxim " *De minimis non curat lex* " must apply. It can not be that, because two or three months after a building has been delivered to the owner and accepted by him it is discovered, for example, that a cord has been omitted from a window sash, and the builder is called upon to furnish it, therefore the work of construction is to be regarded as so far incomplete as to keep open or revive the right of filing notices of mechanics' liens by those who have had no connection

with the omitted detail.  A reasonable construction must
be applied in all such cases; and the question of comple-
tion or non-completion should be determined by what the
common intelligence and the common usage regard as com-
pletion, always, of course, with reference to the provisions
of the building contract.  At the same time we must hold
very distinctly that no amount of work is too small, the
completion of which is required, to prevent the consumma-
tion of a fraud.

But we are not required in the present case to be astute
in the determination of the condition of this work on the
24th day of September, 1896.  For it is very clear to us
from the testimony that the building was not then com-
pleted according to the contract, and that work of consider-
able value remained to be done.  There was a downspout
to be placed on the front of the building at a cost of $14 or
$15; there ·were iron shelves to be placed in the vault for
the books of record of the company, a broken plate-glass
window to be replaced, the mosaic ·work of the floor to be
cleaned and rubbed or polished, some slight alteration or
improvement in the marble work on the front of the build-
ing, some gas fixtures to be hung, and possibly some other
minor things to be done.  The cost or value of all these
things in the aggregate does not appear; but clearly it was
not trifling or inconsiderable, and they were all required
·by the contract.  Until they were done we can not regard
the building as completed in the sense of the mechanics'
lien law so as to affect the rights of the subcontractors in
this case.  We are of opinion that, for the purposes of this
suit, the building was not complete until after the filing of
all the notices of lien.

But in the view which we take of this case it is unim-
portant whether the building was completed or not on
September 24, 1896.  Under the mechanics' lien law ·the
subcontractors had three months after the completion
within which to file their notices; and there is no ·pretense

that their notices were not filed long within the time so limited. Now, if the owner and the builder could, by agreement between themselves for immediate payment on or before completion of the work, cut out the subcontractors who were entitled to liens and to a period of three months after completion for the filing of their notices, it would be a matter of no importance whatever whether the notices were filed before or after such completion. The notices would be worthless, and the law would be nugatory, unless at the actual time of the filing of the notices the owner of the property still retained money in his hands payable on account of the work. The important question, then, is whether, under a building contract providing for specific payments by instalment from time to time as the work progressed and for a final payment upon completion, and upon the production in each case of a receipt or release from the subcontractors, and under the provisions of the mechanics' lien law for the protection of subcontractors, it is competent for the owner and builder to cut out the subcontractors and to nullify the law by a supplemental agreement between themselves to anticipate the final payment and to dispense with the requirement of receipts from the subcontractors? And the answer to this question does not seem to us to be difficult.

In the case of *Herrell* v. *Donovan*, 7 App. D. C. 322, in accordance, as we believe, with the dictates of reason and common justice, and with the tenor of the best reasoned decisions on the subject, we held that the rights of subcontractors under the mechanics' lien law of this District, while arising under the statute, and not by contract, yet were dependent on the contract between the owner and the builder and on the state of the accounts between them; and that the subcontractors were bound by all the terms and conditions of that contract. And this decision we have more than once reaffirmed. Such a construction of the mechanics' lien law we have regarded as necessary to do

justice to the owner of property while protecting the rights of subcontractors. But if the subcontractor, in the enforcement of his statutory right, is bound by the terms of the contract between the owner and the builder, it is a necessary and logical deduction that he is equally entitled to the benefits of the contract so far as it inures to his advantage. Here was a contract in which his rights were properly and sufficiently protected by the provision that the contractor should not be entitled to any payment of money unless upon the production of receipts or releases from the subcontors. It is probable that, with reference at least to the last instalment payable, such would be the necessary implication of the law in the absence of express contract to that effect; for without such implication the provision for the allowance of three months after the completion of the work for the filing of notices of lien would necessarily be ineffective. The subcontractors, therefore, were entitled to suppose in this case that no final payment would be made by the owner to the builder until the latter had fully settled with them, or until they had due notice and opportunity to protect themselves under the law. And this assurance they had, not only from the express terms of the contract, but likewise by repeated declarations of the secretary of the Insurance Company, who was undoubtedly its agent for the purpose, on repeated occasions immediately before the payment of the money; for he several times told the subcontractors, or some of them, who seem to have anticipated some trouble or collusive arrangement by which it would be sought to defraud them of the money which was justly due to them, that the last instalment would not be paid to the contractor until he had settled with all the subcontractors and procured their receipts or releases. And yet, notwithstanding all this, and in total disregard of the express provisions of the contract, by a collusive and fraudulent arrangement, not intended as such by the Insurance Company, but made such by the builder and his sureties, to

whom the money was paid, it was sought to defraud the subcontractors by a premature and clandestine payment, without notice to them, and with the intention undoubtedly on the part of those who received the money to evade satisfaction of their just claims.

It is idle to argue that the owner and the builder had the right to modify their contract, to waive its terms, and to dispense with its prerequisites for the payment of money. Under the circumstances of this case they had no such right, so far as to affect the rights of the subcontractors. The policy of the law forbids any action on their part that would nullify the provisions of the law. It must be conceded that the mechanics' lien law is a restriction upon the freedom of contract; but it must be sustained, as other legislation of a similar character is sustained, upon the broad ground of public policy. It is true that it makes the owner of property liable to persons with whom he has not contracted; but in so doing it does him no wrong. Its practical effect is only to substitute the subcontractor *pro tanto* as his creditor in the place of the contractor. If he has duly and reasonably guarded his own interests he is never called upon to pay more than he has covenanted to pay in his original contract. He enters upon his contract with the common knowledge that it is impossible for the person with whom he contracts to perform the contract by himself alone, and that such person must call in others to his assistance as laborers and subcontractors. It is, therefore, no undue interference with the freedom of contract to require that the rights of those so called in to aid the contractor should be protected. Consequently, when, in pursuance of the policy of the law, and in accordance with its requirements, provision is made for the protection of the rights of subcontractors, and the subcontractors have entered upon the performance of such portion of the work as is assigned to them upon the faith of the contract, it is no longer competent for the original parties, the owner and the builder, by an arrangement between themselves, even in good faith,

to waive the terms of their contract or to modify them in such manner as to affect the rights of the subcontractors, at all events without due notice to these last, and ample opportunity to them to protect their interests. The contract, while it remains the contract only of the original parties to it, has become the basis of a right in the subcontractors independent of both of them.

This conclusion appears to us to be self evident; and it appears to us that any other conclusion would nullify and overthrow the law.

Of the good faith of the Insurance Company by its president and secretary there would seem to be no ground whatever for question. According to the testimony—and herein we prefer to believe the secretary of the company rather than the surety on the contractor's bond who received the money and appropriated it to his own use—the money was paid by the company upon the distinct understanding that this surety would settle with the subcontractors. This he wholly failed to do; and it would appear that he had no intention to do so when he received the check for the money from the company. His violation of trust is chargeable to the Insurance Company which reposed confidence in him and not to the subcontractors who had no part in that confidence. While it was entirely free from actual fraud upon the subcontractors, and even solicitous that these should be fully paid and satisfied, the Insurance Company can not divest itself of its liability to the subcontractors under the contract and under the law by its having intrusted the money to an agent who did not apply it where it should have been applied, and retained it for claims of his own. The company, however, suffers nothing by its improvident payment, beyond the costs of the litigation which it has caused, since it has its remedy on the bond against the surety to whom it paid the money.

From what we have said it follows, in our opinion, that the decree appealed from was right and just, and that it should be *affirmed, with costs. And it is so ordered.*